REED v. WELTY.

(District Court, E. D. Oklahoma. June 26, 1912.)

No. 1,452.

INDIANS (§ 15*)—ALIENATION OF LANDS—ALLOTMENTS TO HEIRS OF ENROLLED CREEK CITIZEN.

Section 7 of the Original Creek Agreement (Act March 1, 1901, c. 676, 31 Stat. 863), and section 16 of the Supplemental Agreement (Act June 30, 1902, c. 1323, 32 Stat. 503), under which allotments of lands were made, providing that lands allotted to citizens shall not in any case be alienable before the expiration of five years from the ratification of the agreements respectively, did not apply to lands allotted to heirs of an enrolled citizen who died before receiving his allotment, and as to such lands the said agreements imposed no restriction upon the right of alienation.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 29, 37–44; Dec. Dig. § 15.*]

In Equity. Suit by Andrew Reed against Edwin A. Welty. On demurrer to bill. Overruled.

Lewis C. Lawson, of Holdenville, Okl., for plaintiff.
Butte, Boone & Lattimore, of Muskogee, Okl., for defendant.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

CAMPBELL, District Judge. The question is on demurrer to the bill. From the bill it appears that Thomas and Mary Knight, husband and wife, were duly enrolled full blood Creek citizens. They had three children, London, Ramsey, and Robert Knight, also duly enrolled full blood citizens of the Creek Nation. Thomas and Mary Knight, the parents, both died intestate in 1901, before receiving their respective allotments, leaving surviving them the three children mentioned as their heirs. After the death of the parents, the land in controversy was allotted to their heirs. Subsequently, and on July 26, 1904, the plaintiff purchased from London and Ramsey Knight their respective interests in the land, securing from them a warranty deed therefor in consideration of $1,300, which deed was duly recorded, and the said London and Ramsey Knight delivered to plaintiff the full possession and control of the land so far as their interests were concerned. Robert Knight was and still is an infant. Plaintiff has been ever since, and now is, either in person or through his tenant, in open, notorious, and adverse possession of said land, and at the time of the execution of the deed by London Knight to defendant, hereinafter mentioned, the said London Knight was not in possession of the land, and had never received any rents from the same. On July 28, 1908, London Knight and his wife Susan Knight executed to the defendant a deed for an undivided one-third interest in the land, who had the same approved by the county court, and had the same recorded. The bill is demurred to on the ground that it states no equity, that there are not sufficient facts alleged to show valid title to the land, and that, on the showing made in the bill, the plaintiff has no title.

There is therefore presented the question whether London and Ramsey Knight, who took as heirs of their father and mother, who were entitled to allotments but died before taking the same, could validly convey their interest in the land as they attempted to do by the deed to plaintiff of July 26, 1904. Counsel for plaintiff asserts the affirmative of this proposition, and relies mainly upon the decision of the United States Supreme Court in Mullen v. United States, 224 U. S. 448, 32 Sup. Ct. 494, 56 L. Ed. 834, decided April 15, 1912. True, this decision involved the Choctaw and Chickasaw Tribes and the Supplemental Agreement (Act July 1, 1902, c. 1362, 32 Stat. 641), under which their lands were allotted. But counsel insists that the provision of the Choctaw and Chickasaw Agreements and the Creek Agreements (Act March 1, 1901, c. 676, 31 Stat. 861, and Act June 30, 1902, c. 1323, 32 Stat. 500), relating to the disposition of lands to which deceased enrolled members would be entitled, if living, are so similar as to make the ruling in the Mullen Case applicable here. In this case, referring to the Choctaw and Chickasaw Supplemental Agreement, Justice Hughes, speaking for the court, says:

"This supplemental agreement provided that there should be allotted to each member of the Choctaw and Chickasaw Tribes land equal in value to 320 acres of the average allotable land of these tribes, and to each Choctaw and Chickasaw freedman land equal in value to 40 acres. The scheme de-

fined two classes of cases: (1) Allotments made to members of the tribes, and to freedmen, living at the time of allotment; and (2) allotments made in the case of those whose names appeared upon the tribal rolls, but who had died after the ratification of the agreement and before the actual allotment had been made. With respect to allotments to living members, it was provided that the allottee should designate 160 acres of the allotted lands as a homestead, for which separate certificate and patent should issue. And the restrictions upon the right of alienation of the allotted lands are found in paragraphs 12, 13, 15, and 16 of the Supplemental Agreement, as follows:

" '12. Each member of said tribes shall, at the time of the selection of his allotment, designate as a homestead out of said allotment land equal in value to one hundred and sixty acres of the average allotable land of the Choctaw and Chickasaw Nations, as nearly as may be, which shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of certificate of allotment, and separate certificate and patent shall issue for said homestead.

" '13. The allotment of each Choctaw and Chickasaw freedman shall be inalienable during the time of the allottee, not exceeding twenty-one years from the date of certificate of allotment. * * *

" '15. Lands allotted to members and freedmen shall not be affected or encumbered by any deed, debt or obligation of any character contracted prior to the time at which said land may be alienated under this act, nor shall said lands be sold except as herein provided.

" '16. All lands allotted to the members of said tribes, except such land as is set aside to each for a homestead as herein provided, shall be inalienable after issuance of patent as follows: One-fourth in acreage in one year, one-fourth in acreage in three years, and the balance in five years; in each case from date of patent: Provided, that such land shall not be alienable by the allottee or his heirs at any time before the expiration of the Choctaw and Chickasaw tribal governments for less than its appraised value.'

"It will be observed that the homestead lands are made inalienable (during the lifetime of the allottee, not exceeding 21 years from the date of certificate allotment). The period of restriction is thus definitely limited, and the clear implication is that, when the prescribed period expired, the lands were to become alienable; that is, by the heirs of the allottee upon his death, or by the allottee himself at the end of the 21 years. Thus, with respect to homestead lands, the supplemental agreement imposed no restriction upon alienation by the heirs of a deceased allottee. And the reason may be found in the fact that each member of the tribes—each minor child as well as each adult, duly enrolled as required—was to have his or her allotment; so that each member was already provided with a homestead as a part of the allotment, independently of the lands which might be acquired by descent. On the other hand, the proviso of paragraph 16, which relates to the additional portion of the allotment, or the so-called 'surplus' lands, contains a restriction upon alienation not only by the allottee, but by his heirs. Whatever may have been the purpose, a distinction was thus made with regard to the disposition by heirs of the homestead and surplus lands, respectively.

"The question now presented, with regard to the conveyances made to the appellants, arises in the second class of cases; that is, where a person whose name appeared upon the rolls died after the ratification of the agreement and before receiving his allotment. In this event, provision was made for allotment in the name of the deceased person, and for the descent of the lands to his heirs. This is contained in paragraph 22 of the Supplemental Agreement: '22. If any person whose name appears upon the rolls, prepared as herein provided, shall have died subsequent to the ratification of this agreement and before receiving his allotment of land the lands to which such person would have been entitled if living shall be allotted in his name, and shall, together with his proportionate share of other tribal property, descend to his heirs according to the laws of descent and distribution as provided in chapter forty-nine of Mansfield's Digest of the Statutes of Arkansas: Provided, that the allotment thus to be made shall be selected by a duly ap-

pointed administrator or executor. If, however, such administrator or executor be not duly and expeditiously appointed, or fails to act promptly when appointed, or for any other cause such selection be not so made within a reasonable and practicable time, the Commissioner to the Five Civilized Tribes, shall designate the lands thus to be allotted.' In the cases falling within this paragraph there is no requirement for the selection of any portion of the allotted lands as a homestead, and there is no ground for supposing that it was the intention of Congress that a provision for such selection should be read into the paragraph so as to assimilate it to paragraph 12 relating to allotments to living members. While the lands were to be allotted in the name of the deceased allottee, they passed at once to his heirs; and as each heir, if a member of the tribe, was already supplied with his homestead of 160 acres, there was no occasion for a further selection for that purpose from the inherited lands. No distinction is made between the heirs. They might or might not be members of the tribe, and, where there were a number of heirs, each would take his undivided share. It is quite evident that there is no basis for implying the requirement that in such case there should be a selection of a portion of the allotment as a homestead, and all the lands allotted under paragraph 22 are plainly upon the same footing. While it appears upon the record that, in the present case, separate certificates of allotment were issued for homestead and surplus lands, this was without the sanction of the statute.

"In the agreement with the Creek Indians (Act of March 1, 1901, 31 Stat 861, 870), it was provided that in the case of the death of a citizen of the tribe after his name had been placed upon the tribal roll made by the Commission, and before receiving his allotment, the lands and money to which he would have been entitled, if living, should descend to his heirs, 'and be allotted and distributed to them accordingly.' The question arose whether in such cases there should be a designation of a portion of the allotment as a homestead. In an opinion under date of March 16, 1903, the then Assistant Attorney General for the Interior Department (Mr. Van Devanter) advised the Secretary of the Interior that this was not required by statute. We said: 'After a careful consideration of the provisions of law pertinent to the question presented, and of the views of the Commissioner of Indian Affairs and the Commission to the Five Civilized Tribes, I agree with the latter that, in all cases where allotment is made directly to an enrolled citizen, it is necessary that a homestead be selected therefrom and conveyed to him by separate deed, but where the allotment is made directly to the heirs of a deceased citizen there is no reason or necessity for designating a homestead out of such lands or of giving the heirs a separate deed for any portion of the allotment, and therefore advise the adoption of that rule.' It is true that under the Creek agreement, in cases where the ancestor died before allotment, the lands were to be allotted directly to the heirs, while under the Choctaw and Chickasaw agreement the allotment was to be made in the name of the deceased member and 'descend to his heirs.' This, however, is a merely formal distinction, and implies no difference in substance. In both cases the lands were to go immediately to the heirs and the mere circumstance that under the language of the statute the allotment was to be made in the name of the deceased ancestor instead of the names of the heirs furnishes no reason for implying a requirement that there should be a designation of a portion of the lands as homestead.

"We have, then, a case where all the allotted lands going to the heirs are of the same character, and there is no restriction upon the right of alienation expressed in the statute. Had the lands been allotted in the lifetime of the ancestor, one-half of them, constituting homestead, would have been free from restriction upon his death. The only difficulty springs from the language of paragraph 16, limiting the right of heirs to sell 'surplus' lands. But, on examining the context, it appears that this provision is part of the scheme for allotments to living members, where there is a segregation of homestead and surplus lands, respectively. Whatever the policy of such a distinction which gives a greater freedom for the disposition by heirs of homestead lands than of the additional lands, there is no warrant for import-

ing it into paragraph 22, where there is no such segregation. It would be manifestly inappropriate to imply the restriction in such cases so as to make it applicable to all the lands taken by the heirs, and there is no occasion, or authority, for creating a division of the lands so as to impose a restriction upon a part of them.

"There being no restriction upon the right of alienation, the heirs in the cases involved in this appeal were entitled to make the conveyances. The bill alleged that the tracts embraced in these conveyances were 'allotted lands,' and certificates of allotment had been issued. These Indian heirs were vested with an interest in the property which in the absence of any provision to the contrary was the subject of sale. The fact that they were 'full blood' Indians makes no difference in this case, for, at the time of the conveyances in question, heirs of the full blood taking under the provisions of paragraph 22 of the supplemental agreement had the same right of alienation as other heirs.

"It does not appear from the allegations of the bill whether patents for the lands had been issued to the Indian grantors before the conveyances were made. But, as the lands had been duly allotted, the right to patent was established; and there was no restriction in cases under paragraph 22 upon alienation of the lands prior to the date of patent. There was undoubtedly a complete equitable interest which, in the absence of restriction, the owner could convey. Doe v. Wilson, 23 How. 457 [16 L. Ed. 584]; Crews v. Burcham, 1 Black, 352 [17 L. Ed. 91]; Jones v. Meehan, 175 U. S. 1, 15, 18 [20 Sup. Ct. 1, 44 L. Ed. 49]. And any contention that the conveyances were invalid solely because they were made before the issuance of patent, the lands not being under restriction, would be met by the proviso contained in section 19 of the act of April 26, 1906 (chapter 1876, 34 Stat. 144): 'Provided further, that conveyances heretofore made by members of any of the Five Civilized Tribes subsequent to the selection of allotment and subsequent to removal of restrictions, where patents thereafter issue, shall not be deemed or held invalid solely because said conveyances were made prior to issuance and recording or delivery of patent or deed; but this shall not be held or construed as affecting the validity or invalidity of any such conveyance, except as hereinabove provided; and every deed executed before, or for the making of which a contract or agreement was entered into before the removal of restrictions, be and the same is hereby, declared void.'

"We are therefore of the opinion that the bill is without equity as against the appellants for the reason that the conveyances were not executed in violation of any restrictions imposed by Congress, and that the demurrer should have been sustained upon this ground."

In the original Creek Agreement, approved March 1, 1901, section 3 provided for the allotment of the lands among the citizens so as to give to each an equal share of the whole as nearly as may be, and then more specifically provided for the amount each member should receive. Section 7 of the same agreement provided that lands allotted to citizens should not at any time be incumbered, etc., prior to the date of the deed therefor to the allottee, and that such land should not be alienable by the allottee or his heirs at any time before the expiration of five years from the ratification of the agreement, without the approval of the Secretary of the Interior. It further provided that each citizen should select from his allotment a homestead which should be nontaxable, inalienable, etc., for 21 years, for which he should have a separate deed. Then follows intervening sections having no bearing on the question here up to section 28. By the latter section it was provided:

"All citizens who were living on the first day of April, 1899, entitled to be enrolled under sec. 21 of the act of Congress approved June 28, 1898, entitled 'An act for the protection of the people of the Indian Territory and for other

purposes,' shall be placed upon the rolls to be made by said Commission under said act of Congress, and if any such citizen has died since that time, or may hereafter die, before receiving his allotments of lands and distributive share of all the funds of the tribe, the lands and money to which he would be entitled if living, shall descend to his heirs according to the laws of descent and distribution of the Creek Nation, and be allotted and distributed to them accordingly."

By the Supplemental Creek Agreement, it was provided:

"Sec. 16. Lands allotted to citizens shall not in any manner whatever, or at any time, * * * be alienated by the allottee or his heirs before the expiration of five years from the date of the approval of this supplemental agreement, except with the approval of the Secretary of Interior. Each citizen shall select * * * a homestead which shall be and remain non-taxable, inalienable, and free from any encumbrance whatever for 21 years from the date of the deed therefore, and a separate deed shall be issued to each allottee for his homestead in which this condition shall appear."

By section 20 of the Supplemental Agreement it appears that it was intended to modify and supplement the Original Agreement, and repeal any conflicting provision in that agreement or any prior agreement, treaty, or law. So that, if the land was allotted to these heirs before the taking effect of the Supplemental Agreement, then their rights are fixed by the Original Agreement; if afterward, then, so far as the inquiry here is concerned, their rights are fixed by the Original Agreement as amended by section 16 of the Supplemental Agreement above quoted. The bill, however, while not giving the date of the allotment, alleges that the lands passed to the heirs under and by virtue of the Original Creek Agreement. Does the provision of section 7 of the Original Agreement, or of section 16 of the Supplemental Agreement, that the lands allotted to citizens shall not be alienable by the allottee or his heirs for the period of five years, apply to lands of the character involved in this case, or is that restriction to be confined in its application to lands allotted direct to living members and not to the lands allotted to heirs of deceased members?

In the Choctaw-Chickasaw Agreement, after providing for allotments to living members, and for the selection of homesteads by them, inalienable for life, not exceeding 21 years, section 16 provided a term of restrictions upon the sale of lands other than homesteads allotted to members. Then section 22 provided that the lands of any member dying before receiving his allotment should be allotted in his name, and should descend to his heirs according to the Arkansas law. Justice Hughes decides that in such case there is no warrant of law for selecting a homestead out of such an allotment. He further decides that the Choctaw-Chickasaw Agreement contemplated two classes of allotments: (1) Allotments to members of the tribes and to freedmen living at the time of the allotment; and (2) allotments made in the case of enrolled members entitled to allotment but dying before actual allotment had been made, and that the restriction prescribed in section 16 applies to the former, and not to the latter. In the Creek Agreement the Commission is dealing with

another one of the Five Tribes, but with the same object in view, that of the allotment of the tribal lands to the individual members, and the agreement is so similar to the Choctaw-Chickasaw Agreement in terms and arrangement, that the two classifications of allotments found by Justice Hughes in the latter agreement may also be said to exist in the former, and, as in the Choctaw-Chickasaw Agreement, the restrictions upon alienation must be held to have only applied to the first class; that is, allotments to members of the tribe living at the time of allotment.

It follows that on July 26, 1904, London and Ramsey Knight had an alienable interest in the land in question, and the demurrer must be overruled.   So ordered.