WELTY v. REED.

(Circuit Court of Appeals, Eighth Circuit. February 3, 1915.)

No. 4057.

1. INDIANS ⬤⇒15—INDIAN LANDS—CREEK AGREEMENT—SALE OF ALLOTMENTS —FIVE-YEAR RESTRICTION—APPLICATION.

The five-year restriction on conveyances of land allotted under Creek Agreement (Act June 30, 1902, c. 1323, 32 Stat. 500), as provided by section 16, applies only to allotments made to living Creek citizens in their own right, and not to those made on behalf of deceased members of the tribe.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 29, 34, 37–44; Dec. Dig. ⬤⇒15.]

2. INDIANS ⬤⇒15 — INDIAN LANDS — ALLOTMENT — CREEK AGREEMENT — RESTRICTIONS ON ALIENATION—RIGHT OF ALLOTTEE.

Land was allotted to K., a full-blood Creek Indian, by the Commission under Curtis Act June 28, 1898, c. 517, 30 Stat. 495. Thereafter the Original Creek Agreement was adopted by Act Cong. March 1, 1901, c. 676, 31 Stat. 861, which became effective by ratification by the Creek Nation May 25th following. K. died April 6, 1901, and patents were issued to his heirs under section 6 of the Agreement, providing that all allotments made to Creek citizens by the Commission prior to the ratification of the Agreement were confirmed, and the same, as to appraisement and all things else, should be governed by the provisions of the Agreement, etc.

*Held* that, there being nothing in the Agreement suggesting necessity for reallotment on the death of the allottee, K., by such allotment, acquired an estate in the land which was inheritable; and hence his heirs, though the patent was issued to them direct, held by reason of their right of inheritance from him, and not as original allottees by virtue of being heirs of a Creek citizen, and the land was subject to the five-year restriction against alienation, except with the approval of the Secretary of the Interior, as provided by Supplemental Creek Agreement (Act June 30, 1902, c. 1323, 32 Stat. 500) § 16.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 29, 34, 37–44; Dec. Dig. ☜15.]

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Ralph E. Campbell, Judge.

Action by Andrew Reed against Edwin A. Welty. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

See, also, 197 Fed. 419.

George S. Ramsey, of Muskogee, Okl. (Robert J. Boone, of Tulsa, Okl., and S. H. Lattimore and C. L. Thomas, both of Muskogee, Okl., on the brief), for appellant.

A. N. Frost, of Muskogee, Okl., and Robert Hardison, of Greenville, Ky., Sp. Asst. Attys. Gen., and James B. Diggs, of Tulsa, Okl., amici curiæ.

Lewis C. Lawson, of Holdenville, Okl., for appellee.

Before HOOK and SMITH, Circuit Judges, and AMIDON, District Judge.

HOOK, Circuit Judge. Reed sued Welty to quiet his title to land which had been allotted under laws relating to the Creek Nation of Indians. Both claimed under conveyances from heirs of Thomas Knight, a Creek citizen of the full blood.

[1] The question is whether the conveyance to Reed, not having been approved by the Secretary of the Interior, violated the restrictions against alienation imposed by section 16 of Act June 30, 1902, c. 1323 (32 Stat. 500), commonly called the Supplemental Creek Agreement. It was made less than five years from the time the Agreement became effective. So far as material, the section is as follows:

"Lands allotted to citizens shall not in any manner whatever or at any time be incumbered, taken, or sold to secure or satisfy any debt or obligation nor be alienated by the allottee or his heirs before the expiration of five years from the date of the approval of this Supplemental Agreement, except with the approval of the Secretary of the Interior. Each citizen shall select from his allotment forty acres of land, or a quarter of a quarter section, as a homestead, which shall be and remain nontaxable, inalienable, and free from any incumbrance whatever for twenty-one years from the date of the deed therefor, and a separate deed shall be issued to each allottee for his homestead, in which this condition shall appear. * * * The homestead of each citizen shall remain, after the death of the allottee, for the use and support of children born to him after May 25, 1901, but if he have no such issue then he may dispose of his homestead by will, free from the limitation herein imposed, and if this be not done the land embraced in his homestead shall descend to his heirs, free from such limitation, according to the laws of descent herein otherwise prescribed. Any agreement or conveyance of any kind or character violative of any of the provisions of this paragraph shall be absolutely void

and not susceptible of ratification in any manner, and no rule of estoppel shall ever prevent the assertion of its invalidity."

In Skelton v. Dill, 35 Sup. Ct. 60, 235 U. S. 206, 59 L. Ed. ―― (decided November 30, 1914), the Supreme Court held these restrictions applied only to allotments made to living Creek citizens in their own right, not to those made on behalf of deceased members of the tribe. Reed's original petition contained an averment that Thomas Knight died intestate before receiving his allotment, and after his death the land in controversy was allotted to his three children as his heirs. On demurrer the trial court held the pleading sufficient—that the restrictions against alienation did not apply. Reed v. Welty, 197 Fed. 419.

[2] This conclusion would be sustained by Skelton v. Dill; but afterwards Reed amended his petition and gave his case a different aspect. It appears from the amended petition that on May 18, 1900, while Thomas Knight was living, the Commission to the Five Civilized Tribes set the land in controversy aside to him as an allotment, that a certificate of allotment of that date was duly issued to him, that he died intestate April 6, 1901, leaving as his heirs three children, who were also on the rolls of Creek citizens of the full blood, and that patents were thereafter duly issued to them.

The allotment to Thomas Knight was made by the Commission under Act June 28, 1898, c. 517, 30 Stat. 495, known as the Curtis Act. This was followed by Act March 1, 1901, c. 676, 31 Stat. 861, commonly called the Original Creek Agreement, which was not to be effective until ratified by the Creek Nation. As already stated, Thomas Knight died April 6, 1901. On May 25, 1901, the Original Agreement was ratified by the Creek Nation and thereafter patents were issued to the heirs. Section 6 of this Agreement provides:

"All allotments made to Creek citizens by said Commission prior to the ratification of this Agreement * * * are confirmed, and the same shall, as to appraisement and all things else, be governed by the provisions of this agreement; and said Commission shall continue the work of allotment of Creek lands to citizens of the tribe as heretofore, conforming to provisions herein. * * *"

According to the amended petition the patents were issued direct to the heirs of Thomas Knight without reallotment of the land to them. It may be observed that section 7 of the Original Agreement contained restrictions against alienation similar to those of section 16 of the Supplemental Agreement; also that under the Curtis Act the lands allotted were nontransferable until after full title was acquired.

It is contended on behalf of Reed, who prevailed below, that Thomas Knight was not an allottee within the meaning of section 16 above quoted, but that the land went direct to his heirs free from restrictions. It is urged that the allotment made to him under the Curtis Act gave merely an exclusive right of use and occupancy of the surface, and not a legal or equitable estate susceptible of inheritance at death; also that, as Thomas Knight died before the Original Creek Agreement became effective, the allotment to him, such as it was, lapsed, there being no such thing as an allotment to a dead person, and therefore in his case there was nothing to confirm by section 6 of that Agreement; and, finally, that the execution of deeds direct

to the children was equivalent to an allotment to them in his behalf. By the express terms of section 16 of the Supplemental Agreement the five-year restriction extended to the "allottee and his heirs." No exception was made of cases where heirs had also received or were entitled to allotments in their own right as citizens. It was quite probable that Creek citizens would secure by direct allotment to them and by inheritance from other allottees more land than needed, or that noncitizens might become owners by inheritance; but the acts of Congress contemplated that whatever hardship the restriction on alienation would cause in such cases should be corrected, if at all, by the Secretary of the Interior, who was authorized to relieve the restriction and approve conveyances. Though it might be clear that allottees should be allowed to sell inherited lands, the terms and conditions of sale by those not greatly competent in such affairs were manifestly important, and control and supervision were wisely vested in the Secretary, who could act according to the circumstances of each particular case. Thomas Knight received an allotment under the Curtis Act, and was therefore an allottee. His allotment was in the class affirmatively designated as "allotments" by the confirmatory section of the Original Agreement. When that Agreement took effect there were 10,000 or more of such allotments under the Curtis Act to approximately two-thirds of the total number of Creek citizens, covering the most thickly settled and improved lands of the Nation. They were none the less allotments, though the estate so evidenced did not embrace the underlying minerals added by the subsequent Agreement. There is nothing in that Agreement suggesting the need of a reallotment upon the death of an allottee.

We also think the estate or right of such an allottee was intended as inheritable. The plans for distribution of the Creek lands were the result of agreement between the government and the Creek Nation. Whatever power Congress might otherwise have exercised, it chose to make the matter the subject of convention with the Indians rather than of pure legislation, and in construing the Agreements regard should be had to the sense naturally conveyed to those principally to be affected. If under the Agreements mere unexercised rights to allotment of lands and moneys were descendible or inheritable (see section 28, Original Agreement, and sections 7 and 8, Supplemental Agreement), there is no difficulty about a right that has been exercised. An allotment to a Creek citizen under the Curtis Act gave an interest or estate that would descend to his heirs at his death. See Goat v. United States, 224 U. S. 458, 470, 32 Sup. Ct. 544, 56 L. Ed. 841. The subsequent patents to the heirs were a recognition of their inheritance of the allotted lands, not of an unexercised right. And that is the theory of the amended petition, though the argument was otherwise. After reciting the allotment to Thomas Knight, his death, the names of his heirs, the patents for the lands, etc., the pleading continues:

"Said lands passed to said heirs in equal parts under and by virtue of the Original Creek Treaty. * * * "

An argument is also made upon the provisions as to homesteads in section 16 of the Supplemental Agreement. The administrative con-

struction was that the limitation discharged upon default of children born after May 25, 1901, was the limitation specially applicable to homesteads, and not the general five-year restriction against alienation by the "allottee or his heirs." However this may be, no selection of a homestead of 40 acres out of the 160 allotted to Thomas Knight appears to have been made, and that fact cannot be employed to repeal the general restriction as to the entire allotment. In this particular the case is unlike Mullen v. United States, 224 U. S. 448, 32 Sup. Ct. 494, 56 L. Ed. 834.

The decree is reversed, and the cause is remanded for further proceedings in conformity with this opinion.