### SUNDAY et al. v. MALLORY et al.

(Circuit Court of Appeals, Eighth Circuit. September 4, 1916.)

No. 4479.

1. INDIANS ⬡⟶15(1)—LANDS—ALLOTMENT OF DECEASED CHEROKEE—RESTRICTIONS ON ALIENATION.

   Land allotted in the name of a deceased Indian, under section 20 of the Cherokee Agreement (Act July 1, 1902, c. 1375, 32 Stat. 716), is not subject to any restrictions on the right of alienation by his heirs; the restrictions imposed by sections 13–15 of the Agreement being applicable only to lands allotted to living members of the tribe.

   [Ed. Note.—For other cases, see Indians, Cent.* Dig. § 37; Dec. Dig. ⬡⟶15(1).]

2. INDIANS ⬡⟶15(1)—LANDS—ALLOTMENT OF DECEASED CHEROKEE—RESTRICTIONS ON ALIENATION.

   Act April 26, 1906, c. 1876, § 19, 34 Stat. 137, imposing restrictions upon alienation of lands allotted to full-blood Indians of the Five Civilized Tribes, applies only to living allottees; and section 22, which makes conveyances by full-blood heirs of a deceased Indian of either of the tribes subject to approval by the Secretary of the Interior, does not have the effect of imposing such restriction upon lands theretofore unrestricted in the hands of heirs of a member of the Cherokee tribe, who died before receiving his allotment, and where selection was made by his administrator.

   [Ed. Note.—For other cases, see Indians, Cent. Dig. § 37; Dec. Dig. ⬡⟶15(1).]

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Ralph E. Campbell, Judge.

Suit in equity by Sidney T. Mallory and others against Andy Sunday and others. Decree for complainants, and certain defendants appeal. Affirmed.

D. H. Linebaugh, U. S. Atty., of Muskogee, Okl., and Paul Pinson, Sp. Asst. U. S. Atty., of Atoka, Okl., for appellants.

J. W. Zevely, J. M. Givens, and R. W. Stoutz, all of Muskogee, Okl., for appellees.

Before SANBORN, Circuit Judge, and REED and BOOTH, District Judges.

BOOTH, District Judge. This was a suit in equity to cancel certain oil and gas leases covering lands in Rogers county, Okl. Appellees Mallory, Brennan, and Brennan were plaintiffs below; all of the other parties were defendants. Both plaintiffs and Bushyhead and Hale, defendants, claimed to be owners of leases covering the lands in question; plaintiffs' leases coming through defendant Warner, as grantee of the lands by conveyance from the heirs of James Sunday, deceased; defendants Bushyhead and Hale's leases coming direct from said Sunday heirs. The facts briefly stated are as follows:

James Sunday was a full-blood Cherokee Indian, and was duly enrolled by the Dawes Commission having charge of the enrollment of the members of the Five Civilized Tribes on the Cherokee roll as No. 16,212 during the year 1900. At the time of said enrollment, James Sunday was over the age of 21 years. In March or April, 1903, James Sunday died, leaving surviving him no parents and no descendants, but leaving as his sole heirs at law six brothers and sisters, as follows: Andy Sunday, David Sunday, Nicholas Sunday, Kate Sunday Hart, Betsy Sunday (later Betsy Sunday Downing), and Sarah Sunday Downing (later Sarah Sunday Downing Kirk). Andy Sunday was duly enrolled by said Dawes Commission as a Cherokee Indian of seven-eighths blood, while Nicholas, Kate, David, Betsy, and Sarah were duly enrolled as full-blood Cherokee Indians.

No selection of allotment of lands for said James Sunday had been made prior to his death, but in the year 1904 a duly appointed and qualified administrator for James Sunday made selection in the name of James Sunday of an allotment of lands described in the complaint, lying partly in section 11, township 22 N., range 14 E., and partly in section 19, township 23 N., range 15 E., all in Rogers county, Okl. Pursuant to said allotment and said selection, patents were duly issued in the name of said James Sunday by the proper tribal authorities on the 31st of March, 1908, which said patents were approved by the Secretary of the Interior of the United States on the 28th day of April, 1908.

On August 8, 1908, Andy Sunday, David Sunday, and Nicholas Sunday executed a warranty deed of their interest in said lands to Elbridge S. Warner. On August 21, 1908, Kate Sunday Hart and her husband and Sarah Sunday Downing Kirk and her husband executed a warranty deed of their interest in said lands to said Elbridge S. Warner. On October 21, 1910, Betsy Sunday executed a warranty deed of her interest in said lands to said Elbridge S. Warner. Said deeds were duly recorded in the office of the register of deeds for Rogers county, Okl.

On March 7, 1913, Elbridge S. Warner executed an oil and gas mining lease in the usual form covering all said above-described lands to Moses P. Lyon. On March 7, 1913, said Moses P. Lyon duly assigned so much of said oil and gas mining lease as covered the lands in section 11 to Sidney T. Mallory; and on April 24, 1913, Sidney T. Mallory made an assignment of an undivided one-third of his interest to Ed. J. Brennan, and another undivided one-third to Joseph H. Brennan.

On April 17, 1913, the heirs of James Sunday, above set forth, notwithstanding their deeds to Warner, executed two oil and gas mining leases to J. C. Bushyhead and Thomas Hale, covering all of the lands

covered by the deeds to Warner. On May 7, 1913, said Bushyhead and Hale filed said leases for approval by the Secretary of the Interior with the United States Indian superintendent at Muskogee, Okl.

The present suit was brought against the heirs of James Sunday, deceased (Verna Murphy and Lewis Downing, heirs of Sarah Sunday Kirk, and their guardian, being substituted for Sarah Sunday Kirk, deceased), also against Bushyhead and Hale, lessees of said heirs, to cancel the leases to Bushyhead and Hale as being a cloud upon title of plaintiffs, and to enjoin the defendants other than the defendant Warner from entering upon, interfering with, or asserting any claim, right, title, or interest in or to the lands covered by the deeds to Elbridge S. Warner; Warner being joined as a defendant as alleged fee owner of the lands in question. Cross-bills were filed by all the defendants except Elbridge S. Warner, praying cancellation of the muniments of title of plaintiffs. Cross-bill was filed by Warner, praying the same relief asked by plaintiffs.

The contention of plaintiffs and of Elbridge S. Warner is that the allotment of lands in the name of James Sunday was at all times unrestricted, and that by the deeds to Warner all the right, title, and interest of the heirs of James Sunday was conveyed, so that the oil lease executed thereafter by Warner to Lyon, and by Lyon assigned (as to part of the land) to Mallory, is a valid and subsisting lease; the plaintiffs being each one-third owners thereof.

The contention of the appellants is that this allotment in the hands of the heirs of James Sunday could not be sold at the time the allotment was selected, nor at any time thereafter: (a) Because the heirs of James Sunday were powerless to alienate his allotment for five years from the date of the ratification of the Cherokee treaty, during which five years the restrictions on alienations were affected by two acts of Congress, neither of which has been complied with in this instance. (b) If the allotment is not impressed with the five-year restriction contained in the Cherokee treaty, nevertheless restrictions were imposed thereon by a subsequent act of Congress.

The trial court held that the allotment in question was not impressed with the five-year restriction contained in the Cherokee treaty, nor with any other restriction upon alienation, and that the deeds to Warner conveyed good title. Decree was accordingly entered, canceling the oil and gas mining leases executed by the heirs of James Sunday to Bushyhead and Hale, enjoining the assertion by said heirs, or by Bushyhead or Hale, of any claim of right, title, or interest in or to said allotment adverse to the interests of the plaintiffs Mallory, Brennan, and Brennan, or the defendant Warner. Cross-bills by said Bushyhead and Hale, and by the heirs of James Sunday, deceased, were by said decree dismissed.

[1] The sections of the Cherokee Agreement having a bearing upon the questions involved, are as follows:

Cherokee Allotment, c. 1375, 32 U. S. Statutes at Large, page 716:

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

11. "There shall be allotted by the Commission to the Five Civilized Tribes and to each citizen of the Cherokee Tribe, as soon as practicable after the approval by the Secretary of the Interior of his enrollment as herein provided,

land equal in value to one hundred and ten acres of the average allottable lands of the Cherokee Nation, to conform, as nearly as may be to the areas and boundaries established by the government survey, which land may be selected by each allottee so as to include his improvements.

\* \* \* \* \* \* \* \* \* \*

13. "Each member of said tribe shall, at the time of the selection of his allotment, designate as a homestead out of said allotment land equal in value to forty acres of the average allottable lands of the Cherokee Nation, as nearly as may be, which shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of the certificate of allotment. Separate certificate shall issue for said homestead. During the time said homestead is held by the allottee the same shall be nontaxable and shall not be liable for any debt contracted by the owner thereof while so held by him.

14. "Lands allotted to citizens shall not in any manner whatever or at any time be incumbered, taken, or sold to secure or satisfy any debt or obligation, or be alienated by the allottee or his heirs, before the expiration of five years from the date of the ratification of this act.

15. "All lands allotted to the members of said tribe, except such land as is set aside to each for a homestead as herein provided, shall be alienable in five years after issuance of patent.

\* \* \* \* \* \* \* \* \* \*

18. "It shall be unlawful after ninety days after the ratification of this act by the Cherokees for any member of the Cherokee Tribe to inclose or hold possession of, in any manner, by himself or through another, directly or indirectly, more lands in value than that of one hundred and ten acres of average allottable lands of the Cherokee Nation, either for himself or for his wife, or for each of his minor children, if members of said tribe; and any member of said tribe found in such possession of lands, or having the same in any manner inclosed, after the expiration of ninety days after the date of the ratification of this act shall be deemed guilty of a misdemeanor.

\* \* \* \* \* \* \* \* \* \*

20. "If any person whose name appears upon the roll prepared as herein provided shall have died subsequent to the first day of September, nineteen hundred and two, and before receiving his allotment, the lands to which such person would have been entitled if living shall be allotted in his name, and shall, with his proportionate share of other tribal property, descend to his heirs according to the laws of descent and distribution as provided in chapter forty-nine of Mansfield's Digest of the Statutes of Arkansas: Provided, that the allotment thus to be made shall be selected by a duly appointed administrator or executor. If, however, such administrator or executor be not duly and expeditiously appointed, or fails to act promptly when appointed, or for any other cause such selection be not so made within a reasonable and proper time, the Dawes Commission shall designate the lands thus to be allotted.

\* \* \* \* \* \* \* \* \* \*

25. "The roll of citizens of the Cherokee Nation shall be made as of September first, nineteen hundred and two, and the names of all persons then living and entitled to enrollment on that date shall be placed on said roll by the Commission to the Five Civilized Tribes.

\* \* \* \* \* \* \* \* \* \*

31. "No person whose name does not appear upon the roll prepared as herein provided shall be entitled to in any manner participate in the distribution of the common property of the Cherokee tribe, and those whose names appear thereon shall participate in the manner set forth in this act: Provided, that no allotment of land or other tribal property shall be made to any person, or to the heirs of any person, whose name is on said roll and who died prior to the first day of September, nineteen hundred and two," etc.

The date of the ratification of the Cherokee Agreement was August 8, 1902.

The controversy turns upon two questions: First. Whether the land selected by the administrator of the estate of James Sunday,.

237 F.—34

descended to Sunday's heirs under section 20 of the Cherokee Agree-
ment free from restrictions, or subject to the restrictions mentioned
in section 14 of said agreement. Second. Whether the act of April
26, 1906 (34 Stat. 137), imposed restrictions on the alienation of said
lands, even if theretofore the alienation was unrestricted.

Taking up the first question, and considering the sections of the
Cherokee Agreement above quoted, it will be noted that the scheme
of allotment first considers allotments to living members of the tribe.
Section 11 provides for an allotment to each citizen of the tribe. Sec-
tion 13 provides that each member of the tribe shall out of his allot-
ment designate a homestead, and that this homestead shall be in-
alienable during the life of the allottee, not to exceed 21 years from
the date of the certificate of allotment. Section 14 provides that the
lands allotted to citizens shall be inalienable by the allottee or his
heirs, and shall not be sold to satisfy debt, or be alienated before the
expiration of five years from the date of the ratification of the act.
Section 15 provides that lands allotted to members, except such as
are set aside for a homestead, shall be alienable in five years after
the issuance of patent.

Section 20 provides for a second class of allotments, viz. allotments
in cases where enrolled members of the tribe die subsequent to the
1st day of September, 1902, and before receiving an allotment. The
allotment is taken in the name of the deceased member, but it descends
immediately to his heirs, whether or not they are citizens of the
tribe. No restriction upon alienation of such lands by the heirs is
found in section 20; but it is contended that the restrictions con-
tained in sections 13, 14 and 15 apply to allotments made under sec-
tion 20.

Section 13 has to do with homesteads, and provides by implication
that they become alienable by the heirs of the allottee upon the death
of the allottee. If sections 13, 14, and 15 all apply to allotments under
section 20, it would seem somewhat anomalous that the homestead
should be alienable by the heirs immediately, but that other lands
should remain inalienable for a period. This anomaly disappears if
sections 13, 14, and 15 are held to be applicable to allotments to living
citizens only, and as not restricting allotments made under section 20.

In the case of Mullen v. United States, 224 U. S. 448, 32 Sup. Ct.
494, 56 L. Ed. 834, the court had under consideration a very similar
question arising under the Choctaw and Chickasaw Agreement (Act
July 1, 1902, c. 1362, 32 Stat. 641). The sections of that agreement
under consideration were as follows:

12. Each member of said tribes shall, at the time of the selection of his al-
lotment, designate as a homestead out of said allotment land equal in value
to one hundred and sixty acres of the average allottable lands of the Choc-
taw and Chickasaw Nations, as nearly as may be, which shall be inalienable
during the lifetime of the allottee, not exceeding twenty-one years from the
date of certificate of allotment, and separate certificate and patent shall issue
for said homestead.

13. The allotment of each Choctaw and Chickasaw freedman shall be in-
alienable during the lifetime of the allottee, not exceeding twenty-one years
from the date of certificate of allotment.

15. Lands allotted to members and freedmen shall not be affected or incumbered by any deed, debt, or obligation of any character contracted prior to the time at which said land may be alienated under this act, nor shall said lands be sold except as herein provided.

16. All lands allotted to the members of said tribes, except such land as is set aside to each for a homestead as herein provided, shall be alienable after issuance of patent as follows: One-fourth in acreage in one year, one-fourth in acreage in three years, and the balance in five years; in each case from date of patent: Provided, that such land shall not be alienable by the allottee or his heirs at any time before the expiration of the Choctaw and Chickasaw tribal governments for less than its appraised value.

22. If any person whose name appears upon the rolls, prepared as herein provided, shall have died subsequent to the ratification of this agreement and before receiving his allotment of land, the lands to which such person would have been entitled if living shall be allotted in his name, and shall, together with his proportionate share of other tribal property, descend to his heirs according to the laws of descent and distribution as provided in chapter forty-nine of Mansfield's Digest of the Statutes of Arkansas: Provided, that the allotment thus to be made shall be selected by a duly appointed administrator or executor. If, however, such administrator or executor be not duly and expeditiously appointed, or fails to act promptly when appointed, or for any other cause such selection be not so made within a reasonable and practicable time, the Commission to the Five Civilized Tribes shall designate the lands thus to be allotted.

The question in the Mullen Case was whether the restrictions on alienation provided in sections 12, 13, 15, and 16, or any of them, were applicable to lands allotted under section 22. The court held that such restrictions were not applicable. The court said:

"In the cases falling within this paragraph, there is no requirement for the selection of any portion of the allotted lands as a homestead, and there is no ground for supposing that it was the intention of Congress that a provision for such selection should be read into the paragraph so as to assimilate it to paragraph 12 relating to allotments to living members. While the lands were to be allotted in the name of the deceased allottee, they passed at once to his heirs, and as each heir, if a member of the tribe, was already supplied with his homestead of 160 acres, there was no occasion for a further selection for that purpose from the inherited lands. No distinction is made between the heirs; they might or might not be members of the tribe, and where there were a number of heirs each would take his undivided share. It is quite evident that there is no basis for implying the requirement that in such case there should be a selection of a portion of the allotment as a homestead, and all the lands allotted under paragraph 22 are plainly upon the same footing. While it appears from the record that, in the present case, separate certificates of allotment were issued for homestead and surplus lands, this was without the sanction of the statute."

Continuing, the court said:

"We have, then, a case where all the allotted lands going to the heirs are of the same character and there is no restriction upon the right of alienation expressed in the statute. Had the lands been allotted in the lifetime of the ancestor, one-half of them, constituting homestead, would have been free from restriction upon his death. The only difficulty springs from the language of paragraph 16, limiting the right of heirs to sell 'surplus' lands. But, on examining the context, it appears that this provision is part of the scheme for allotments to living members, where there is a segregation of homestead and surplus lands respectively. Whatever the policy of such a distinction which gives a greater freedom for the disposition by heirs of homestead lands than of the additional lands, there is no warrant for importing it into paragraph 22 where there is no such segregation. It would be manifestly inappropriate to imply the restriction in such cases so as to make it applicable to all the

lands· taken by the heirs, and there is no occasion, or authority, for creating a division of the lands so as to impose a· restriction upon a part of them."

"There being no restriction upon the right of alienation, the heirs in the cases involved in this appeal were entitled to make the conveyances. The bill alleged that the tracts embraced in these conveyances were 'allotted lands,' and certificates of allotment had been issued. These Indian heirs were vested with an interest in the property which in the absence of any provision to the contrary was the subject of sale. The fact that they were 'full-blood' Indians makes no difference in this case for, at the time of the conveyances in question, heirs of the full-blood taking under the provisions of paragraph 22 of the Supplemental Agreement had the same right of alienation as other heirs."

In our opinion the Mullen Case is controlling here. While there are some differences in the provisions as to allotments to living members between the Choctaw and Chickasaw Agreement and the Cherokee Agreement, both contain similar schemes of allotments to living members and to enrolled members dying before allotment. The provision in section 22 of the Choctaw and Chickasaw Agreement is almost identical with section 20 of the Cherokee Agreement in the instant case. If, as the court held in the Mullen Case, the provisions containing restrictions upon alienation of lands allotted to living members were not applicable to allotments under section 22 in case of members enrolled, but dying before allotment, we see no reason why the same rule should not apply as to allotments under section 20 in the Cherokee Agreement.

In Skelton v. Dill, 235 U. S. 206, 35 Sup. Ct. 60, 59 L. Ed. 198, the Supreme Court construed correspondingly similar sections in the Creek Agreement; section 16 of the Supplemental Creek Agreement (Act June 30, 1902, 32 Statutes at Large, 500, c. 1323) reading as follows:

"Lands allotted to citizens shall not in any manner whatever or at any time be incumbered, taken, or sold to secure or satisfy any debt or obligation nor be alienated by the allottee or his heirs before the expiration of five years from the date of the approval of this Supplemental Agreement, except with the approval of the Secretary of the Interior. Each citizen shall select from his allotment forty acres of land, or a quarter of a quarter section, as a homestead, which shall be and remain nontaxable, inalienable, and free ·from any incumbrance whatever for twenty-one years from the date of the deed therefor, and a separate deed shall be issued to each allottee for his homestead, in which this condition shall appear.

"Selections of homesteads for minors, prisoners, convicts, incompetents and aged and infirm persons, who cannot select for themselves, may be made in the manner provided for the selection of their allotments, and if for any reason such selection be not made for any citizen it shall be the duty of said Commission to make selection for him. The homestead of each citizen shall remain, after the death of the allottee, for the use and support of children born to him after May 25, 1901, but if he have no such issue then he may dispose of his homestead by will, free from the limitation herein imposed, and if this be not done the land embraced in his homestead shall descend to his heirs, free from such limitation, according to the laws of descent herein otherwise prescribed. Any agreement or conveyance of any kind or character violative of any of the provisions of this paragraph shall be absolutely void and not susceptible of ratification in any manner, and no rule of estoppel shall ·ever prevent the assertion of its invalidity."

Sections 7 and 8 of the Supplemental Agreement read as follows:

7. "All children born to those citizens who are entitled to enrollment as provided by the act of Congress approved March 1, 1901 (31 Stat. 861), sub-

sequent to July 1, 1900, and up to and including May 25, 1901, and living upon the latter date, shall be placed on the rolls made by said Commission. And if any such child has died since May 25, 1901, or may hereafter die before receiving his allotment of lands and distributive share of the funds of the tribe, the lands and moneys to which he would be entitled if living shall descend to his heirs as herein provided and be allotted and distributed to them accordingly.

8. "All children who have not heretofore been listed for enrollment living May 25, 1901, born to citizens whose names appear upon the authenticated rolls of 1890 or upon the authenticated rolls of 1895 and entitled to enrollment as provided by the act of Congress approved March 1, 1901 (31 Stat. 861), shall be placed on the rolls made by said Commission. And if any such child has died since May 25, 1901, or may hereafter die, before receiving his allotment of lands and distributive share of the funds of the tribe, the lands and moneys to which he would be entitled if living shall descend to his heirs as herein provided and be allotted and distributed to them accordingly."

And section 28 of the Original Creek Agreement (Act March 1, 1901, 31 Stat. at Large, 861, c. 676):

28. "All citizens who were living on the first day of April, eighteen hundred and ninety-nine, entitled to be enrolled under section twenty-one of the act of Congress approved June twenty-eighth, eighteen hundred and ninety-eight, entitled 'An act for the protection of the people of the Indian Territory, and for other purposes,' shall be placed upon the rolls to be made by said commission under said act of Congress, and if any such citizen has died since that time, or may hereafter die, before receiving his allotment of lands and distributive share of all the funds of the tribe, the lands and money to which he would be entitled, if living, shall descend to his heirs according to the laws of descent and distribution of the Creek Nation, and be allotted and distributed to them accordingly."

The court held that the restrictions in section 16 did not apply to allotments made in cases of members dying before receiving their allotment. After citing the cases of Rentie v. McCoy, 35 Okl. 77, 128 Pac. 244, and Reed v. Welty (D. C.) 197 Fed. 419, the court said:

"We think the better reasoning lies with the view that the restrictions apply only to allotments made to living citizens in their own right. Not only do the provisions of section 16 of the Supplemental Act lend themselves to that view, but in those sections of both acts which deal with allotments on behalf of deceased persons there is no suggestion of a restriction upon alienation. This difference in legislative treatment doubtless was deliberate and reflects a corresponding difference in purpose. In Mullen v. United States, 224 U. S. 448 [32 Sup. Ct. 494, 56 L. Ed. 834], a like question arose under the Original and Supplemental Acts relating to the Choctaw and Chickasaw lands, and we held that the restrictions upon alienation imposed by those acts were applicable to allotments to living members in their own right but not to allotments on behalf of members then deceased. We do not perceive anything in the acts relating to the Creek lands which calls for a different conclusion."

See Greenlees v. Wettack, 43 Okl. 16, 141 Pac. 282, where the Supreme Court of Oklahoma reached the same conclusion in regard to section 20 of the Cherokee Agreement. See, also, Adkins v. Arnold, 235 U. S. 417, 35 Sup. Ct. 118, 59 L. Ed. 294; Woodward v. De Graffenried, 238 U. S. 284, 35 Sup. Ct. 764, 59 L. Ed. 1310; Welty v. Reed, 231 Fed. 930, —— C. C. A. —— (C. C. A. 8th) March 9, 1916; and Reed v. Welty (D. C.) 197 Fed. 419; also Rentie v. McCoy, 35 Okl. 77, 128 Pac. 244—all placing a similar construction upon the correspondingly similar section in the Creek Agreement. See, also, Hancock v. Mutual Trust Co., 24 Okl. 391, 103 Pac. 566, placing a similar

construction upon section 22, the correspondingly similar section in the Choctaw-Chickasaw Agreement.

An opposite conclusion has been reached by the Supreme Court of Kansas as to section 20 of the Cherokee Agreement in case of Morris v. Greenlees, 90 Kan. 472, 135 Pac. 569, but we are unable to concur in the views therein expressed.

It is said, however, that section 14 of the Cherokee Agreement has no counterpart in the Choctaw-Chickasaw Agreement, and that therefore the holding in the Mullen Case is not conclusive. However this contention may be in regard to the Choctaw-Chickasaw Agreement involved in the Mullen Case, said section 14 of the Cherokee Agreement has an exact counterpart in the first portion of section 16 of the Supplemental Creek Agreement, which was construed by the Supreme Court in Skelton v. Dill, supra. Nevertheless the court said that it saw nothing in the acts relating to the Creek lands which called for a different conclusion from that reached in the Mullen Case in regard to the Choctaw and Chickasaw lands.

It is contended, further, that the first portion of section 16 of the Supplemental Creek Agreement does not correspond with section 14 of the Cherokee Agreement, but rather with section 15. This position is not tenable. It requires a mere comparison of the language in the first portion of section 16 of the Supplemental Creek Agreement with the language of section 14 of the Cherokee Agreement to show that they are an exact equivalent of each other, so far as concerns that class of allotments which is restricted in alienation.

[2] Taking up the second question, as to the effect of the act of April 26, 1906 (34 Stat. at Large, 137), it may be stated, without discussion, that inasmuch as we hold that the lands allotted in the name of James Sunday were not restricted as to alienation when they passed to his heirs, it is not necessary to consider whether the act of April 26, 1906, extended restrictions theretofore existing.

It remains to consider, however, whether said act imposed restrictions where none existed theretofore. Two sections are claimed to have this effect, section 19 and section 22. They read so far as material, as follows:

"19. That no full-blood Indian of the Choctaw, Chickasaw, Cherokee, Creek or Seminole Tribes shall have power to alienate, sell, dispose of or incumber in any manner any of the lands allotted to him for a period of twenty-five years from and after the passage and approval of this act unless such restriction shall, prior to the expiration of said period, be removed by act of Congress; and for all purposes the quantum of Indian blood possessed by any member of said tribes shall be determined by the rolls of citizens of said tribes approved by the Secretary of the Interior: Provided, however, that such full-blood Indians of any of said tribes may lease any lands other than homesteads for more than one year under such rules and regulations as may be prescribed by the Secretary of the Interior; and in case of the inability of any full-blood owner of a homestead, on account of infirmity or age, to work or farm his homestead, the Secretary of the Interior, upon proof of such inability, may authorize the leasing of such homestead under such rules and regulations: Provided further, that conveyances heretofore made by members of any of the Five Civilized Tribes subsequent to the selection of allotment and subsequent to removal of restriction, where patents thereafter issue, shall not be deemed or held invalid solely because said conveyances were made prior to issuance and recording or delivery of patent or deed; but this

shall not be held or construed as affecting the validity or invalidity of any such conveyance, except as hereinabove provided; and every deed executed before, or for the making of which a contract or agreement was entered into before the removal of restrictions, be and the same is hereby, declared void: Provided further, that all lands upon which restrictions are removed shall be subject to taxation, and the other lands shall be exempt from taxation as long as the title remains in the original allottee.

\* \* \* \* \* \* \* \* \* \*

"22. That the adult heirs of any deceased Indian of either of the Five Civilized Tribes whose selection has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribe to which he or she belongs or belonged, may sell and convey the lands inherited from such decedent; and if there be both adult and minor heirs of such decedent, then such minors may join in a sale of such lands by a guardian duly appointed by the proper United States Court for the Indian territory. And in case of the organization of a state or territory, then by a proper court of the county in which said minor or minors may reside or in which said real estate is situated, upon an order of such court made upon petition filed by guardian. All conveyances made under this provision by heirs who are full-blood Indians are to be subject to the approval of the Secretary of the Interior, under such rules and regulations as he may prescribe."

A careful reading of section 19 clearly indicates that it has reference only to living allottees, and not to the heirs of allottees. In the instant case the heirs of James Sunday took not as allottees. See Shulthis v. McDougal, 170 Fed. 529, 95 C. C. A. 615.

It is claimed, however, that section 22 is applicable. There is nothing in the language which specifically imposes restrictions on allotments theretofore unrestricted, and especially when taken by the heirs of a deceased member on selection by an administrator, and we think it more in consonance with the language used, and more in accord with the construction placed upon the restriction clauses of the several agreements above discussed, to hold that section 22 of the act of April 26, 1906, does not impose restrictions upon lands theretofore unrestricted in the hands of heirs of a member of the Cherokee Tribe, who died before receiving his allotment, and where selection was made by his administrator.

In the case of Bartlett v. United States, 203 Fed. 410, 121 C. C. A. 520, this court held that it was not within the power of Congress to impose restrictions upon the alienation of lands allotted to an Indian after the restrictions imposed by prior laws had expired, and that acts general in their terms should not be construed as intended to apply to such cases. In that case, 160 acres had been allotted on June 30, 1902, to Moses Wiley, a duly enrolled three-quarter blood Creek Indian, and patent issued to Wiley March 10, 1903. On January 26, 1912, Wiley and his wife conveyed 120 acres, being the portion other than his homestead, to Bartlett, and Bartlett thereafter conveyed to Lashley. The United States filed its bill in equity to cancel the deeds from Wiley to Bartlett, and from Bartlett to Lashley, claiming that the act of May 27, 1908 (35 Stat. at Large, 312, c. 199) imposed restrictions upon the alienation of the Wiley land. The five-year original restriction had expired by limitation on the 7th of August, 1907. The act of 1908, so far as here material, is found in section 1, and is as follows:

"That from and after sixty days from the date of this act the status of the lands allotted heretofore or hereafter to allottees of the Five Civilized Tribes shall, as regards restrictions on alienation or incumbrance, be as follows: * * * And all allotted lands of enrolled full-bloods, and enrolled mixed-bloods of three-quarters or more Indian blood, including minors of such degrees of blood, shall not be subject to alienation, contract to sell, power of attorney, or any other incumbrance prior to April twenty-sixth, nineteen hundred and thirty-one, except that the Secretary of the Interior may remove such restrictions, wholly or in part under such rules and regulations concerning terms of sale and disposal of the proceeds for the benefit of the respective Indians as he may prescribe. The Secretary of the Interior shall not be prohibited by this act from continuing to remove restrictions as heretofore, and nothing herein shall be construed to impose restrictions removed from land by or under any law prior to the passage of this act. * * * "

The court in its opinion said:

"It is contended on the part of appellants that the foregoing act of May, 1908, is inapplicable, as it expressly provided that the act should not be construed as imposing restrictions removed from land by or under any law prior to the passage of that act; that, as the restrictions in this case had expired prior to the passage of the act, they came within the exception, for, as is argued, the restriction being imposed by an act of Congress, and limited to a period of five years, when that period expired the restriction was removed by the law which imposed it. It is unnecessary for us to pass upon the correctness of this statement, however, for we are of the opinion that it was not the intent, nor within the power, of Congress, to reimpose a restriction upon the alienation of lands against which none at the time existed. True it is that the Supreme Court, in Tiger v. Western Investment Co., 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738, held that it was within the power of Congress to continue or extend the period of restriction against alienation during the period of an existing restriction against alienation. The Supreme Court, however, in that case, expressly referred to the fact that the title to the allotment was still held by the United States in trust for the Indian; that, while the land was held by the United States in trust for the Indian allottee, it was competent for Congress to extend the trust period, and prohibit alienation during such extended period. We find nothing in that case holding that, after the trust period had expired and both the legal and equitable title had fully vested in the allottee, such allottee being a citizen of the United States, Congress could thereafter reach out and withdraw the land from alienation and taxation by the state and local municipalities. As soon as the title, both legal and equitable, to the land in question became vested in Moses Wiley, it was subject to taxation by the state and county authorities, and Moses Wiley had full dominion over the same, notwithstanding in many respects the government still retained a guardianship over him."

It would seem to follow that, if Congress had not the power to reimpose restrictions upon alienation after the original restrictions had been removed, it would not have the power to impose restrictions where none whatever had theretofore existed.

The Bartlett Case was affirmed by the Supreme Court in 235 U. S. 72, 35 Sup. Ct. 14, 59 L. Ed. 137. The court, however, rested its decision upon the ground that the restrictions which had at one time existed upon the Wiley land had been terminated by lapse of time, as contemplated by the law imposing them, and that such restrictions were "removed from the land by or under" the prior law, within the meaning of the excepting clause in the section of the statute of May 27, 1908, above quoted. While the case was affirmed, therefore, the Supreme Court did not pass upon the question of the power of Congress to reimpose restrictions upon the alienation where they had been

removed. We see no reason, however, for changing the opinion of this court in the Bartlett Case, as applied to the facts therein disclosed.

United States v. Western Investment Co., 226 Fed. 726, 141 C. C. A. 482, was a case where Lewis Bird, a full-blood Indian, received an allotment on April 20, 1899, and died April 14, 1901. The allotment was therefore made prior to the ratification of the Original Creek Agreement, which was May 25, 1901. On April 24, 1907, his widow ·executed a deed to the Western Investment Company, and later the Western Investment Company, by its trustee in bankruptcy, conveyed ·to one Bilby. Under section 7 of the Original Creek Agreement, allotments made to citizens were inalienable during five years from ratification of the agreement, except with the approval of the Secretary of the Interior. This period had expired prior to the conveyance by Mary Bird. However, the act of April 26, 1906 (34 Stat. 137), had been passed, which by section 22 provided that adult full-blood heirs of deceased Indians should make no conveyance without the approval of the Secretary of the Interior. It was held that the act applied and that Mary Bird could not make a conveyance without the approval of the Secretary of the Interior. It is to be noted that in this case the allotment had been made to a citizen, prior to the ratification of the Original Creek Agreement, and that his death occurred prior to the ratification of this agreement.

The conclusion reached was based upon a holding that such an allotment was subject to restrictions as to its alienation, and followed Welty v. Reed, 219 Fed. 864, 135 C. C. A. 534; but the latter case upon rehearing (231 Fed. 930, 145 C. C. A. 309) was reversed on this point, in view of the decision in Woodward v. De Graffenried, 238 U. S. 284, 35 Sup. Ct. 764, 59 L. Ed. 1310.

Brader v. James (Okl.) 154 Pac. 560, was a case where Cerena Wallace, a full-blood Choctaw Indian, died October 27, 1905. An allotment had been made to her during her lifetime. Her daughter, Rachel James, her sole surviving heir at law, on the 17th of August, 1907, her husband joining, attempted to convey a part of the lands inherited, consisting of the homestead and a portion of surplus lands. September 13, 1909, the purchaser, Tillie Brader, quitclaimed to J. H. Brader, the defendant. The deed of Rachel James and husband to Tillie Brader was never approved by the Secretary of the Interior. Action was brought by Rachel James to recover possession. Under the Choctaw-Chickasaw Agreement, homestead lands became alienable upon the death of the allottee and the question in the case was whether the act of April 26, 1906, requiring the approval of the Secretary of the Interior applied. The ·court, after a full review of the authorities, held that it did, and that the statute was not unconstitutional. The court in its opinion called particular attention to the fact that the lands had been allotted to Cerena Wallace during her lifetime, and expressly refrained from holding that the same effect would be given to the act of 1906, if applied to conveyances made by full-blood Indian heirs of enrolled tribal members who died subsequent to enrollment, but before selecting their allotments and where selections were made thereafter by their administrator.

In Sampson v. Staples (Okl.) decided a month later by the same court, 155 Pac. 213, the court held that the act of April 26, 1906, and the act of May 27, 1908, did apply to conveyances of inherited lands made in 1910 and 1911 by full-blood heirs of a Choctaw Indian who died in 1903, and this though the ancestress died before receiving her allotment, and the allotment was selected in her name and descended to her heirs under section 22 of the Choctaw-Chickasaw Agreement, and that while the heirs of the deceased allottee had a right to convey their interest in the lands prior to the passage of the act of April 26, 1906, after its passage they could not do so without the approval of the Secretary of the Interior.

The case last cited appears to be squarely in point, and to support the contention of the appellant here. We feel, however, compelled to take a different view. The same reasons which have led the courts to hold that restrictions upon alienations in the several Indian Agreements above discussed do not apply to cases where heirs take lands selected by the administrator of the ancestor duly enrolled, but dying before allotment, lead us to the conclusion that section 22 of the Act of April 26, 1906, was also not intended to apply to such cases.

Congress, in passing the various acts heretofore discussed, was legislating for large classes of cases, and not for isolated instances. Furthermore, Congress was keeping in mind, while imposing restrictions upon the alienation of these Indian lands: First, whether the restrictions were necessary in certain classes of cases; and, secondly, to what extent. The broad plan of legislation was to protect the allotments of lands made to individual living members, as such, whether while remaining in the hands of the original allottee, or thereafter, while in the hands of his heirs; the purpose being to conserve such allotments, first, for the benefit of the original allottee; second, to a less full extent for the benefit of his heirs. The plan of legislation did not contemplate restricting alienations of all lands that a full-blood Indian might in any wise acquire; for example, by purchase, or in any other manner than from the government. In other words, it was not merely the relationship of guardian and ward between the government and the Indian that was the foundation and reason for restrictions upon alienation of his land, but it was this relationship plus the plan of distributing allotments of lands in severalty to living members of the several tribes, and the restrictions were limited to the reasonable carrying out of the plan. It was in view of such considerations that restrictions were imposed upon alienation of allotments to living members, first, while in the hands of the allottee; and, secondly, to a less extent while in the hands of the heirs.

There would naturally be two classes of heirs of the duly enrolled members: The first class, those heirs whose ancestors became actual allottees; the second class, those whose ancestors were duly enrolled, but died before receiving allotment. The first class would be presumably large; the second, naturally, comparatively small. Furthermore, in the second class would be naturally many persons who were living at the time of the taking effect of the enrollment, and who would be themselves enrolled and entitled to allotments, and such allotments would carry the usual restrictions, so that the necessary protection

would be afforded them in connection with their own allotments. In the instant case, all of the heirs of James Sunday were themselves duly enrolled. It is true that there might be full-blood heirs born, after the final enrollment date, to an Indian duly enrolled, but who died before receiving his allotment; but such a class would in the nature of things be very small and was probably deemed by Congress negligible. It was doubtless with these considerations in mind that Congress, in making the several Indian Agreements, saw fit not to place restrictions upon alienation in cases where the lands were taken by heirs of ancestors duly enrolled, but dying before allotment. The same considerations lead us to believe that Congress did not intend to impose restrictions upon such lands by the act of April 26, 1906. By the provisions in the several Indian Agreements, Congress had definitely relinquished its hold upon such lands. The lands did not become subject to restrictions at the time they were taken by the heirs; and it would seem to require very plain language to show an intention on the part of Congress to impose new restrictions as to such lands, where no restrictions whatever had theretofore existed.

It is our opinion that the lands in question were taken by the heirs of James Sunday, deceased, free from any restrictions upon alienation; furthermore, that the act of April 26, 1906, was not intended to place restrictions upon the alienation of such lands, and did not in fact do so.

The judgment and decree of the lower court is affirmed.