### *KENNY v. MILES et al.

No. 7708—Opinion Filed Jan. 2, 1917.

Rehearing Denied Jan. 30, 1917.

Second Application for Rehearing Denied
June 6, 1917.

(162 Pac. 775.)

1. **Indians—Indian Lands—Restrictions.**

Act Cong. June 28, 1906, c. 3572, 34 Stat.
at L. 539, placed no restrictions upon the
alienation by heirs of inherited lands allot-
ted and deeded in the right of a member of
the Osage Tribe of Indians after his death,
save only the mineral interests therein re-
served to the tribe, individual disposition of
which is expressly inhibited.

2. **Same.**

The purpose of Act Cong. April 18, 1912, 37
Stat. at L. 86, c. 83, was not to impose re-
strictions upon alienation of Osage lands, but
to authorize the conveyance of such of said
lands to which restrictions had attached by
reason of their allotment to living members
of the tribe, who had subsequently died, leav-
ing surviving them Indian heirs, members of
the tribe, to whom certificates of competency
were issued.

(Syllabus by Bleakmore, C.)

Error from District Court, Osage County;
A. R. Musseller, Special Judge.

Action by John Kenny, plaintiff, against
Laban Miles and others, defendants. Judg-
ment for defendants, and plaintiff brings er-
ror. Affirmed.

Edward R. Hastings, Paul Van Winkle,
and John Embry, for plaintiff in error.

H. P. White, for defendants in error.

Opinion by BLEAKMORE, C. Plaintiff in
error seeks the reversal of a judgment of the
district court of Osage county rendered April
2, 1915, upon appeal from the county court
of that county, ordering a distribution of the
estate of a deceased member of the Osage
Tribe of Indians, consisting of lands selected
and patented in her name subsequent to her
death, and certain proceeds arising from the
rental thereof.

The decedent, Lah-tah-sah, a member
of the Osage Tribe, entitled to a distributive
share of the tribal property by virtue of an
act of Congress approved June 28, 1906 (34
Stat. 539), died intestate in 1908, before re-
ceiving the same. After her death the lands
involved were selected in her right, and deeds
therefor, approved by the Secretary of the
Interior, were executed in her name as gran-
tee, and recorded. These lands descended to

*Appealed to the Supreme Court of the United States.

her heirs according to the laws of the state
of Oklahoma.

On February 28, 1912, Laban Miles, defend-
ant in error, began an action in the district
court of Osage county to effect a partition
of said lands, alleging that he was the sur-
viving husband, and John Kenny, the plain-
tiff in error, the only child of Lah-tah-sah,
and that upon her death each succeeded
to an undivided one-half of the lands there-
after allotted and patented in her name.
To this petition John Kenny filed his answer
and cross-petition, averring that he was
the only heir of the decedent, the sole owner,
in constructive possession of the premises,
and entitled to the exclusive possession there-
of, that the claim of Laban Miles constituted
a cloud upon his title, etc., and prayed for
relief accordingly. The sole controverted is-
sue of fact in this action was the marriage
of Laban Miles to Lah-tah-sah. The court,
after hearing evidence, made elaborate find-
ings of fact, determined such issue in favor
of Miles, ordered partition of the lands, and
appointed commissioners for such purpose.
Later the administrator of the estate of Lah-
tah-sah filed his final report in the county
court of Osage county praying a distribution
of the portion thereof in his possession, con-
sisting of the lands allotted in her name and
the income therefrom. John Kenny appeared
in such proceeding and asserted that he was
the sole heir of Lah-tah-sah, and entitled to
the entire estate. Laban Miles responded,
setting forth that such claim had been tried
and finally determined by the district court
of Osage county in the partition action, and
pleaded the judgment therein as conclusive
of the rights of Kenny and himself to share
equally in the distribution of said lands and
proceeds. To this plea of res judicata Kenny
demurred. The demurrer was overruled, and
upon hearing the property was ordered dis-
tributed equally between him and Miles.
Appeal was had to the district court, with
like result.

Both Kenny and Miles are members of the
Osage Tribe, and neither has received a cer-
tificate of competency.

The provisions of the act of June 28,
1906, supra, are fully set forth in the opinion
of the Supreme Court of the United States
in Levindale Lead & Zinc Mining Co. v.
Coleman (July 15, 1916) 241 U. S. 432, 36
Sup. Ct. 644, 60 L. Ed. 1080, as follows:

"That act provided that the roll of the
Osage Tribe as it existed on January 1, 1906,
with the additions specified, should be the roll
of the tribe and constitute its 'legal mem-
bership.' Children born between January 1,
1906, and July 1, 1907, to persons whose
names were on the roll on the first-men-

tioned date, 'including the children of members of the tribe who have, or have had, white husbands,' were to be recognized as members for the purposes of the division. Section 1. All lands were to be divided 'among the members of said tribe, giving to each his or her fair share thereof in acres' tions were imposed as follows: 'Each member' as shown by the roll was to be allowed to make three selections of 160 acres each in the manner described. Section 2. Restrictions weer imposed as follows: 'Each member of said tribe shall be permitted to designate which of his three selections shall be a homestead, and his certificat of allotment and deed shall designate the same as a homestead, and the same shall be inalienable and nontaxable until otherwise provided by act of Congress. The other two selections of each member, together with his share of the remaining lands allotted to the member, shall be known as surplus land, and shall be inalienable for twenty-five years, except as hereinafter provided.' Section 2, fourth.

"After 'each member' has made the three selections, the remaining lands of the tribe, except as stated, were to be divided 'as equally as practicable among said members by a commission to be appointed.' Section 2, fifth. The Secretary of the Interior in his discretion, at the request of any 'adult member of the tribe,' was to issue 'to such member a certificate of competency, authorizing him to sell and convey any of the lands deeded him by reason of this act, except his homestead, which shall remain inalienable and nontaxable for a period of twenty-five years, or during the life of the homestead allottee,' if, upon investigation, 'he shall find any such member fully competent' to care for his affairs. It was provided that upon the issuance of such a certificate of competency the lands of such 'member,' except homestead lands, should 'become subject to taxation,' and that 'such member,' except as provided, should have the right to 'manage, control and dispose of his or her lands the same as any citizen of the United States.' It was further provided that the surplus lands should be 'nontaxable' for the period of three years from the approval of the act, 'except where certificates of competency are issued or in case of the death of the allottee, unless otherwise provided by Congress.' Section 2, seventh. Oil, gas, coal or other minerals 'covered by the lands' were 'reserved to the Osage Tribe for a period of twenty-five years.' Id. sec. 3. All funds belonging to the tribe, and moneys accruing to it, were to be 'held in trust by the United States for the period of twenty-five years' from January 1, 1907, except as provided. The funds of the tribe, and moneys accruing from the sale of Kansas lands, together with those due upon claims against the United States, were to be segregated and placed to the credit of the 'individual members' of the tribe 'on a basis of a pro rata division,' or 'to their heirs as hereinafter provided,' and such credit was to draw interest, to be 'paid quarterly to the members entitled thereto'; and the disposition of royalties from mineral leases was specially prescribed. Section 4. At the expiration of 25 years from January 1, 1907, the lands, mineral interests, and moneys held in trust by the United States were to be the absolute property of the 'individual members' of the tribe, according to the roll, 'or their heirs, as herein provided,' and deeds were to be issued accordingly. Section 5.

"Sections 6 and 7 are as follows:

" 'Sec. 6. That the lands, moneys, and mineral interests, herein provided for, of any deceased member of the Osage Tribe shall descend to his or her legal heirs, according to the laws of the territory of Oklahoma, or of the state in which said reservation may be hereinafter incorporated, except where the decedent leaves no issue, nor husband nor wife, in which case said lands, moneys, and mineral interests, must go to the mother and father equally.

" 'Sec. 7. That the lands herein provided for are set aside for the sole use and benefit of the individual members of the tribe entitled thereto, or to their heirs, as herein provided; and said members, or their heirs, shall have the right to use and to lease said lands for farming, grazing, or any other purpose not otherwise specifically provided for herein, and said members shall have full control of the same, including the proceeds thereof; Provided, that parents of minor members of the tribe shall have the control and use of said minors' lands, together with the proceeds of the same, until said minors arrive at their majority. And provided further, that all leases given on said lands for the benefit of the individual members of the tribe entitled thereto, or for their heirs, shall be subject to the approval of the Secretary of the Interior.'

"Deeds to the Osage lands were to be executed by the principal chief, but were not to be valid until approved by the Secretary of the Interior (section 8), and it was further provided that whatever was necessary to carry into effect the provisions of the act should be done under the authority of this officer (section 12). Regulations have been adopted by the Secretary of the Interior governing the leasing (under sections 7, 12) of lands 'allotted to Osage Indians.' These provide, among other things, that 'lands of deceased allottees may be leased by the heirs jointly,' as stated. Regulations 11, 12, approved October 25, 1910; 8, approved June 17, 1913."

By joint congressional resolution approved February 27, 1909 (35 Stat. at L. 1167), it is provided:

"That homesteads of members of the Osage Tribe of Indians in Oklahoma may consist of land designated from any one or more of their first three allotment selections

taken under the act of Congress approved June twenty-eighth, nineteen hundred and six; entitled, 'An act for the division of the lands and funds of the Osage Indians in Oklahoma Territory, and for other purposes,' the designation thereof to be subject to approval by the Secretary of the Interior."

By section 6 of an act of Congress of April 18, 1912 (37 Stat. at L. 87), it is provided:

"That from and after the approval of this act the lands of deceased Osage allottees, unless the heirs agree to partition the same, may be partitioned or sold upon proper order of any court of competent jurisdiction in accordance with the laws of the state of Oklahoma; Provided, that no partition or sale of the restricted lands of a deceased Osage allottee shall be valid until approved by the Secretary of the Interior. Where some of the heirs are minors, the said court shall appoint a guardian ad litem for said minors in the matter of said partition, and partition of said land shall be valid when approved by the court and the Secretary of the Interior. When the heirs of such deceased allottees have certificates of competency or are not members of the tribe, the restrictions on alienation are hereby removed. If some of the heirs are competent and others have not certificates of competency, the proceeds of such part of the sale as the competent heirs shall be entitled to shall be paid to them without the intervention of an administrator. The shares due minor heirs, including such minor Indian heirs as may not be tribal members and those Indian heirs not having certificates of competency, shall be paid into the treasury of the United States and placed to the credit of the Indians upon the same conditions as attach to segregated shares of the Osage national fund, or with the approval of the Secretary of the Interior paid to the duly appointed guardian. The same disposition as herein provided for with reference to the proceeds of inherited lands sold shall be made of the money in the treasury of the United States to the credit of deceased Osage allottees."

It is contended by plaintiff in error that the lands involved constitute the homestead and surplus allotment of a deceased member of the Osage Tribe, and by virtue of the foregoing congressional enactments are alienable only upon issuance of certificates of competency to the heirs.

Defendant in error insists that no restrictions upon alienation of the lands in question by the heirs of decedent ever existed, for the reason that such lands were not selected, nor a homestead therein designated, by the deceased member of the tribe in her lifetime, but that such selection was made in her right and deeds therefor executed in her name after her death, and therefore such lands are neither homestead nor surplus, but constitute a separate and distinct class of allotment upon the alienation of which no restrictions were imposed by Congress.

As sustaining his contention, plaintiff in error relies upon United States v. Aaron (C. C.) 183 Fed. 347, affirmed by the Circuit Court of Appeals, Eighth Circuit, in Aaron v. United States, 204 Fed. 943, 123 C. C. A. 265, wherein it was held:

"(1) Lands of full-blood Osage Indian allottees selected by and allotted to them before their decease were inalienable by their full-blood heirs in March, 1909, under Act June 28, 1906, c. 3572, 34 Stat. 539, 541, 542, where none of them had obtained certificates of competency.

"(2) The homestead lands of such allottees were likewise inalienable by such heirs. The fourth paragraph of section 2 of Act June 28, 1906, c. 3572, 34 Stat. 541, provided that the homestead lands of Osage Indian allottees 'shall be inalienable and nontaxable until otherwise provided by Act of Congress.' The seventh paragraph of the same section declared that the Secretary might issue to any member of the Osage Tribe a certificate of competency, authorizing him to deed his lands, 'except his homestead, which shall remain inalienable and nontaxable for a period of 25 years, or during the life of the allottee.'"

The opinions in the case relied upon are not decisive of the question here presented, for the reason that the same was not involved or determined therein as shown by the language employed in the latter opinion, namely:

"But counsel for the appellants contend that no restriction upon alienation was ever imposed upon the lands here in question, because they were not selected by Cena June, nor did she designate her homestead therein, and thus divide them into homestead lands and surplus lands, nor were they allotted to her before her decease, but they were selected and allotted to her heir after her decease, so that they constitute a different class of lands from either the homestead lands or the surplus lands, and thus are exempt from all restrictions upon their alienation under the decisions in Mullen v. United States, 224 U. S. 448, 452, 457, 32 Sup. Ct. 494, 56 L. Ed. 834, and Hancock v. Mutual Trust Company, 24 Okla. 391, 103 Pac. 566. A careful examination of the record, however, has satisfied us that the defendants are conclusively estopped from making this claim. The complainant alleged in its bill that a described part of the lands here in controversy was allotted to Cena June 'as the homestead of said Cena June, duly selected as and for such homestead,' and that a described portion of them was allotted to the said Cena June 'as her surplus lands.' The agreed statement of facts, upon which the case was heard and the

decree was founded, contained a stipulation that under the act of June 28, 1906, 'Cena June, who was a duly enrolled member of the Osage Tribe of Indians in Oklahoma, received as her homestead allotment the lands described and set forth as her homestead allotment in paragraph 2 of the amended bill,' and "* * * that said Cena June was duly allotted as a member of said tribe as the lands set forth as her surplus selection in the amended bill herein.' Consequently it is too late now for the appellants to claim that the selections, the designation of the homestead, and the allotments were not made until after the death of Cena June. * * *"

In Levindale Lead & Zinc Mining Co. v. Coleman, supra, it is asid:

"Taken in their natural sense, the provisions of the fourth paragraph of section 2 apply only to allotments made to members of the tribe. There is nothing to suggest that a nonmember should designate a 'homestead,' and unless lands were thus segregated the restrictions as to 'homesteads' would not apply. With respect to 'surplus lands,' it will be observed that it is only selections of each 'member,' and the share of remaining lands 'allotted' to the member,' which constitute lands so described, and thus come under the stated restrictions. It was early ruled administratively that under section 6 the right to the member's share, though unallotted in his lifetime, passed to his legal heirs as there defined, and this we assume to be the meaning of the statute. But the fact that the nonmember takes in the right of the deceased member is not enough to subject him to restrictions which are plainly imposed for the protection of members. It is urged that the restrictions, by virtue of their terms, were to run with the land until they expired by limitation or were removed (Bowling v. United State. 233 U. S. 528, 34 Sup. Ct. 659, 58 L. Ed. 1080), but restrictions would not run with the land unless they had attached. And, even where they had attached, they would run only according to the intendment of the statute. We find no indication of an intent that they should apply to land, or an interest in lands, which had come lawfully into the ownership of white men who were nonmembers of the tribe. Emphasis is placed by the defendant in error on the provisions of section 7 as to leases; but it would be an inadmissible construction of this section to say that the word 'heirs' was there used in contradistinction to 'members.' This provision as to leases, in the light of the purpose of the act, had reference, we think, to the 'individual members' who received allotments and the Indian heirs of such members.

"The view we have taken of the inapplicability of the restrictions upon alienation in a case like the present finds support in the fact that there was no provision for giving to nonmembers certificates of competency. Under the seventh paragraph of section 2,

any 'adult member' of the tribe, although a full-blood Indian, who could satisfy the Secretary of the Interior of his ability to transact his own business, might obtain a certificate, and thus be enabled to dispose of his 'surplus land'; but a competent white man not a member, could not be relieved. It would seem to be evident that such an incongruous result was not intended, the language plainly showing that Indians alone were deemed to be subjected to the restrictions."

It would seem that the only restrictions placed upon alienation of the allotted lands of the Osage Tribe are found in the fourth paragraph of section 2 of the act of June 28, 1906, supra, and "apply only to allotments made to members of the tribe."

The general scheme for division of the Osage lands was similar to that adopted for the distribution of those of the Five Civilized Tribes, contemplating, primarily, their allotment to living members of the tribe, separating the homestead and surplus, and providing certain restrictions upon alienation and exemption from taxation obviously for the better protection of the allottee in the quiet enjoyment thereof; but, anticipating that such character of allotments would become impossible in the event of the death of members entitled thereto, Congress provided in such contingency for allotments going immediately to heirs, in the right of such deceased members, of the shares of the tribal property which they would have been entitled to receive had they survived. As to the latter class of allotments, no provision was made for the segregation of the homestead and surplus, and no occasion for such separation existed; as each of said heirs, if a member of the tribe, was provided with a homestead fully protected in his own right.

In neither the Osage Division Act nor the Allotment Act relating to the Five Civilized Tribes (save perhaps in one instance) was there a distinction made between heirs; they might or might not be members of the tribe, but each would take his undivided share under the particular act in the same manner and with the same powers of disposition, unless otherwise expressly provided.

In Mullen v. United States, 224 U. S. 448, 32 Sup. Ct. 494, 56 L. Ed. 834, involving the Choctaw and Chickasaw Allotment Acts, it is said:

"It is true that under the Creek Agreement, in cases where the ancestor died before allotment, the lands were to be allotted directly to the heirs, while under the Choctaw and Chickasaw Agreement the allotment was to be made in the name of the deceased member and 'descend to his heirs.' This, however, is a merely formal distinction, and implies no difference in substance. In both

cases the lands were to go immediately to the heirs, and the mere circumstance that, under the language of the statute, the allotment ʹwas to be made in the name of the deceased ancestor instead of the names of the heirs furnishes no' reason for implying a requirement that there should be a designation of a portion of the lands as homestead.

"We have, then, a case ᵛhere all the allotted lands going to the heirs are of the same character and there is no restriction upon the right of alienation expressed in the statute. Had the lands been allotted in the lifetime of the ancestor, one-half of them, constituting homestead, would have been free from restriction upon his death. The only difficulty springs from the language of paragraph 16, limiting the right of heirs to sell 'surplus' lands. But, on examining the context, it appears that this provision is part of the scheme for **allotments to living members, where there is a segregation of homestead and surplus lands respectively.** Whatever the policy of such a distinction which gives a greater freedom for the disposition by heirs of homestead lands than of the additional lands, there is no warrant for importing it into paragraph 22 where there is no such segregation. It would be manifestly inappropriate to imply the restriction in such cases so as to make it applicable to all the lands taken by the heirs, and there is no occasion or authority for creating a division of the lands so as to impose a restriction upon a part of them. (Emphasis ours.)

"There being no restriction upon the right of alienation, the heirs in the case involved in this appeal were entitled to make the conveyances. The bill alleged that the tracts embraced in these conveyances were 'allotted lands,' and certificates of allotment had been issued. These Indian heirs were vested with an interest in the property which, in the absence of any provision to the contrary, was the subject of sale. The fact that they were 'full-blood' Indians makes no difference in this case for, at the time of the conveyances in question, heirs of the full-blood taking ʰunder the provisions of paragraph 22 of the supplemental agreement had the same right of alienation as other heirs."

. In the Mullen· Case, supra, the Supreme Court of the United States further says:

"While the lands were to be allotted in the name of the deceased allottee, they passed at once to his heirs, and as each heir, if a member of the tribe, was already supplied with his homestead of 160 acres, there was no occasion for a further selection for that purpose from the inherited lands. No distinction is made between the heirs; they might or might not be members of the tribe, and where there were a number of heirs, each would take his undivided share. It is quite evident that there is no basis for implying the requirement that in such case there should be a selection of a portion of

the allotment as a homestead, and all the lands allotted under paragraph 22 are plainly upon the same footing. While it appears from the record that in the present case separate certificates of allotment were issued for homestead and surplus lands, this was without the sanction of the statute."

In Skelton v. Dill, 235 U. S. 206, 35 Sup. Ct. 60, 59 L. Ed. 198, construing the Allotment Acts of the Creek Tribe, it is said:

"Evidently anticipating that participation in the allotment· and distribution might in some instances be cut off by death, Congress made provisions for such a contingency. * * *

"Whether these restrictions were intended to apply only to allotments made to living citizens in their own right or to apply as well to allotments made on behalf of deceased members is the question for decision. The Supreme Court of the state, when passing upon this case, held them applicable to both classes of allotments, but in the later case of Rentie v. McCoy, 35 Okla. 77, 128 Pac. 244, reached the other conclusion, as did also the District Court for the Eastern District of Oklahoma in Reed v. Welty (D. C.) 197 Fed. 419. We think the better reasoning lies with the view that the restrictions apply only to allotments made to living citizens in their own right. Not only do the provisions of section 16 of the supplemental act lend themselves to that view, but in those sections of both acts which deal with allotments on behalf of deceased persons there is no suggestion of a restriction upon alienation. This difference in legislative treatment doubtless was deliberate, and reflects a corresponding difference· in purpose. In Mullen v. United States, 224 U. S. 448, 32 Sup. Ct. 494, 56 L. Ed. 834, a like question arose under the original and supplemental acts relating to the Choctaw and Chickasaw lands, and we held that the restrictions upon alienation imposed by those acts were applicable to allotments to living members in their own right, but not to allotments on behalf of members then deceased. We do not perceive anything in the acts relating to the Creek lands which calls for a different conclusion. * * *"

We hold that the act of June 28, 1906, placed no restrictions upon alienation by heirs of inherited lands allotted and deeded in the right of a member of the Osage Tribe after his death, save only the interest in the minerals reserved to the tribe, the individual disposition of which is expressly inhibited.

The evident purpose of the act of April 18, 1912, supra, was not to impose restrictions upon alienation of Osage lands, but to authorize the conveyance of such of said lands to which restrictions had attached by reason of their allotment to living members of the tribe who had subsequently died, leaving surviving them Indian heirs, members of

the tribe, to whom certificates of competency were issued.

In Levindale Lead & Zinc Mining Co. v. Coleman, it was said:

"* * * But it is the act of 1912 upon which chief reliance is placed. This was 'supplementary to and amendatory of' the act of 1906, and provides among other things, in section 6, relating to the lands 'of deceased Osage allottees' that 'when the heirs of such deceased allottees have certificates of competency or are not members of the tribe, the restrictions on alienation are hereby removed.' We lay aside the suggestion that 'deceased Osage allottees' may be taken to mean only members who received allotments in their own right while living, expressing no opinion upon that point. For not only is a legislative declaration of the intent of a previous act not absolutely controlling, but we think that in the present instance the purpose of Congress is manifest. This suit had been decided in the district court of the state in December, 1910, and it had been there held that the restriction applied to nonmembers. The case had been appealed, but it may well be supposed that Congress intended to remove the restriction upon a nonmember, if such a restriction could be deemed to exist. That, we are satisfied, was the object of the provision, and it was not an attempt to import into the earlier act a restriction which lay wholly outside its express terms and the policy of guardianship it was intended to execute."

We conclude that the district court of Osage county had jurisdiction to partition the lands involved, and that its judgment was conclusive of the rights of the parties in this proceeding to share equally in the disposition of the lands in question.

In view of this conclusion it is unnecessary to determine the very interesting questions presented by the briefs relative to the capacity in which the district court of Osage county would have acted and the conclusiveness of this judgment in the event it had been held that the lands in question were restricted lands such as contemplated by the act of April 18, 1912, supra.

It follows that the judgment of the court below should be affirmed.

By the Court: It is so ordered.