## KENNY *v.* MILES ET AL.

CERTIORARI TO THE SUPREME COURT OF THE STATE OF OKLAHOMA.

No. 179.   Argued January 24, 1919.—Decided May 19, 1919.

Subject to the provisions as to certificates of competency, lands allotted as homestead and surplus respectively, under the Act of June 28, 1906, c. 3572, 34 Stat. 539, in the right of a deceased Indian member of the Osage tribe, duly enrolled, and descending to Indian heirs, likewise members duly enrolled, are subject to the same restrictions on alienation as are imposed upon lands allotted to living members. P. 63. *Levindale Lead Co.* v. *Coleman*, 241 U. S. 432; *Mullen* v. *United States*, 224 U. S. 448; and *Skelton* v. *Dill*, 235 U. S. 206, distinguished.

Section 6 of the Act of April 18, 1912, c. 83, 37 Stat. 86, provides that "the lands of deceased Osage allottees, unless the heirs agree to partition the same, may be partitioned or sold upon proper order of any court of competent jurisdiction in accordance with the laws of the State of Oklahoma: *Provided,* That no partition or sale of the restricted lands of a deceased Osage allottee shall be valid until approved by the Secretary of the Interior." *Held:* (1) That the term "restricted lands" refers to the restrictions on alienation imposed by Congress to protect the Indians from their own incompetency, (p. 61); and (2) that, in the absence of approval by the Secretary, a judgment for partition or sale, in a suit brought under this section in the state court respecting such lands, is inoperative, so that a finding of heirship, forming a part of it, is not conclusive in other proceedings. P. 65.

162 Pac. Rep. 775, reversed.

THE case is stated in the opinion.

*The Solicitor General*, with whom *Mr. Assistant Attorney General Kearful* was on the brief, for petitioner.

*Mr. H. P. White* for respondents.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

In concluding a proceeding in the county court of Osage County, Oklahoma, for the settlement of the estate of Lah-tah-sah, a deceased Indian woman, it became necessary to determine who were her heirs. Two claimants appeared and sought to establish such a relation. One, John Kenny, claimed to be a son and the sole heir; and the other, Laban Miles, claimed to be the surviving husband and an equal heir with Kenny. It was conceded that Kenny was a son, but it was disputed that Miles ever was the deceased's husband. If he was such when she died, he and Kenny were equal heirs; otherwise Kenny was the sole heir.

At the hearing in that proceeding Miles produced and relied on a judgment in a partition suit, which he had brought against Kenny in the district court of the same county, wherein it was found that he and the deceased were married about a year before her death and that he remained her husband until she died. Over Kenny's protest, based on congressional enactments presently to be noticed, the county court treated that judgment as a conclusive determination of the matters so found and rejected evidence produced by Kenny to show that there had been no such marriage. It was accordingly adjudged that Miles and Kenny were equal heirs, and that decision was affirmed by the Supreme Court of the State. 162 Pac. Rep. 775. The case is here on writ of certiorari.

Whether, consistently with the congressional enactments on which Kenny's protest was based, the judgment in the partition suit could be treated as conclusive of the matters therein found is the ultimate federal question in the case.

Lah-tah-sah was an Indian of the Osage tribe, duly enrolled as such. This entitled her to share in the division and allotment of the lands and funds of the tribe under the Act of June 28, 1906, c. 3572, 34 Stat. 539. She died intestate August 19, 1908. Thereafter two tribal deeds naming her as grantee,[1] and approved by the Secretary of the Interior, were issued under that act. The deeds were for lands allotted to her or in her right out of the tribal lands. One was for 160 acres designated as a homestead, and the other was for 500.12 acres designated as surplus lands. Both purported to pass a title in fee simple, subject to the conditions, limitations and provisions of the act. It was to these lands that the judgment in the partition suit related. That judgment treated the lands as inherited from Lah-tah-sah and ordered that they be partitioned equally between Miles and Kenny as her heirs, or, if not susceptible of partition in kind, that they be sold with a view to an equal division of the proceeds.

By § 6 of the Act of April 18, 1912, c. 83, 37 Stat. 86, which is supplementary to and amendatory of the Act of 1906, it is provided that "the lands of deceased Osage allottees, unless the heirs agree to partition the same, may be partitioned or sold upon proper order of any court of competent jurisdiction in accordance with the laws of the State of Oklahoma: *Provided*, That no partition or sale of the restricted lands of a deceased Osage allottee shall be valid until approved by the Secretary of the Interior." It was after this enactment that the partition suit was

---

[1] As to the legal effect of the deeds issued to her after her death, see besides § 6 of the Act of 1906, Rev. Stats. § 2448; *Crews* v. *Burcham*, 1 Black, 352, 356; *United States* v. *Chase*, 245 U. S. 89, 101.

begun, and there was here no approval by the Secretary of the Interior.

Kenny's protest was based on the Acts of 1906 and 1912 and was to the effect that the lands to which the partition suit related were restricted lands and that in consequence the judgment for their partition or sale was of no effect in the absence of the prescribed approval by the Secretary of the Interior.

The term "restricted lands" in § 6 of the Act of 1912 means lands the alienation of which is subject to restrictions imposed by Congress to protect the Indians from their own incompetency. This is shown by a later sentence in the same section and by various provisions in the Act of 1906.

To determine whether the lands ordered to be partitioned or sold were restricted requires some consideration of the Act of 1906, for it was under that act that they were allotted and the tribal deeds issued. By its first section the act makes the tribal roll as existing January 1, 1906, with eliminations and additions not material here, the authentic roll of the members for the purposes of the act. By its second section it provides that the tribal lands, with stated exceptions, shall be divided among the members in such way as to give each a fair share in acres; that every member "shown by the roll" shall be permitted to select three tracts of 160 acres each; that after all have made the three selections the remaining lands, with some exceptions, shall be divided as equally as practicable by a designated commission, and that—

"Fourth. . . . Each member of said tribe shall be permitted to designate which of his three selections shall be a homestead,[1] and his certificate of allotment and deed shall designate the same as a homestead, and the same

[1] A subsequent joint resolution permitted the homestead to be designated from lands in any one or more of the three selections. February 27, 1909, 35 Stat. 1167.

shall be inalienable and nontaxable until otherwise provided by Act of Congress. The other two selections of each member, together with his share of the remaining lands allotted to the member, shall be known as surplus land, and shall be inalienable for twenty-five years, except as hereinafter provided."

The second section further provides (par. 7) that when any adult member is found fully competent to care for his own affairs the Secretary of the Interior may issue to him a certificate of competency authorizing him to sell and convey any of the lands deeded to him under the act other than his homestead, which where the certificate issues [1] is to remain inalienable for twenty-five years, or during the life of the homestead allottee. Other sections reserve to the tribe for twenty-five years the oil, gas, coal and other minerals in the allotted lands and provide that the tribal funds and moneys, with specified exceptions, shall be placed to the credit of the several members "shown by the authorized roll," or their heirs, on the basis of a pro rata division and shall be held in trust by the United States for twenty-five years. The sixth section is as follows:

"Sec. 6. That the lands, moneys, and mineral interests, herein provided for, of any deceased member of the Osage tribe shall descend to his or her legal heirs, according to the laws of the Territory of Oklahoma, or of the State in which said reservation may be hereinafter incorporated, except where the decedent leaves no issue, nor husband nor wife, in which case said lands, moneys, and mineral interests must go to the mother and father equally."

The seventh section shows that the allotted lands are for the sole use of the individual members, or their heirs, and that the same may be leased, subject to the restriction that to be effective "all leases," whether for the benefit of the individual members or their heirs, must have the

---

[1] See *Aaron v. United States*, 204 Fed. Rep. 943, 945–946.

approval of the Secretary of the Interior; and the eighth section provides that the deeds to allottees shall be executed by the principal chief of the tribe, but shall not be valid until the Secretary of the Interior approves them.

The Act of 1912, in its sixth section, treats the restraints applicable to living allottees as also applicable to such of the heirs of deceased allottees as are members of the tribe, and expressly provides that "when the heirs of such deceased allottees have certificates of competency . . . the restrictions on alienation are hereby removed."

Lah-tah-sah died without receiving a certificate of competency. Kenny and Miles, who claim to be her heirs, are of Osage blood and members of the tribe, and neither has received such a certificate. Thus the case differs materially from *Levindale Lead Co.* v. *Coleman*, 241 U. S. 432, where it was held to be obvious from an examination of the entire Act of 1906 that the restrictions on alienation were imposed to secure the welfare of Indians—wards of the United States—and were not intended to apply to lands, or undivided interests therein, inherited by white men who were not members of the tribe. There a white man, who as heir of a deceased Osage wife and child took an undivided interest in lands allotted in their behalf after their death, was held to have an unrestricted right to alienate his interest; but the court was careful to indicate that it was not dealing with the interests of Indian heirs.

The Act of 1906 makes it plain that all whose names were on the authentic roll were to share in the division of the tribal property. They were the "members" among whom the lands were to be allotted in stated portions. Lah-tah-sah, being one of them, was entitled to such an allotment. It was made in her name, but whether before or after her death is left uncertain by the record. The court below treated it as made after her death and held that the lands were not restricted, its decision being put

on the ground that the restrictions on alienation are not applicable to lands allotted in the right of deceased members, but only to such as are allotted to members living at that time. We cannot assent to that conclusion.

Under the Act of 1906 the death of a member entitled to an allotment does not extinguish his right. According to the implication of the act and the administrative rulings, the allotment still may be made in his name. Where this is done he is regarded as the allottee and his heirs as taking by descent from him. Such allotments and all others are made under one comprehensive provision, in which there is no distinctive mention of either living or deceased members. The restrictions are imposed by another provision equally comprehensive, and it makes no distinction between lands allotted to living members and those allotted in the right of deceased members. Nor is any such distinction made in the section dealing with descent. The heirs are generally Indians, and seldom white men. When they are Indians they are equally within the occasion for the restrictions, whether the allotment be to a living member or in the right of one deceased, *Talley* v. *Burgess*, 246 U. S. 104, 108; and in either case some may be without any allotment of their own, because born after the time for closing the roll. Thus those who take under allotments made in the right of deceased members are no less within the letter and spirit of the restrictions than are other heirs. That all are intended to be protected is shown by the leasing provision, which requires that "all leases" on the part of heirs shall have the approval of the Secretary of the Interior.

We, therefore, are of opinion that the lands allotted in Lah-tah-sah's name were restricted lands, whether allotted before or after her death.

The Act of 1906 is quite unlike the earlier acts considered in the cases of *Mullen* v. *United States*, 224 U. S. 448, and *Skelton* v. *Dill*, 235 U. S. 206, which are cited

in support of the conclusion below. Those acts, as was pointed out in our opinions, contained separate provisions for two classes of allotments—one to members living at the time, and the other in the right of deceased members. In the provisions dealing with the first class there were express restrictions on the right of alienation, and in those dealing with the second class there was an entire absence of such restrictions. Because of this difference in terms, we held that Congress intended that allotments of the second class should be unrestricted. The differences between those earlier acts and that of 1906 are pronounced and reasonably can be explained on no other theory than that Congress intended that all allotments under the Act of 1906 should be restricted, subject of course to the issue of certificates of competency. And that this is what was intended becomes even more manifest when it is considered that in the meantime Congress had imposed other restrictions in respect of allotments under the earlier acts and in doing so had discarded the distinction before made between the two classes of allotments so far as full-blood Indian heirs were concerned. *Talley* v. *Burgess, supra.*

We have seen that the provision in the Act of 1912 under which the partition suit was brought and entertained declares that where the lands are restricted, as was the case here, no partition or sale shall be valid until approved by the Secretary of the Interior. No approval was given in this instance. In consequence the judgment ordering a partition or sale—it had no other purpose—was inoperative. It could not be executed and was not binding on any one. The findings were part of it and were of no force apart from it.

It results that Kenny's protest against the use made of that judgment was well grounded.

*Judgment reversed.*